**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DARRON O.**

                **Plaintiff,**

**v.**                                                                  **1:20-CV-00090 (NAM)**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**[1]

                **Defendant.**
_____

**Appearances:**

Charles E. Binder
Law Office of Charles E. Binder and
Harry J. Binder, LLP
485 Madison Avenue, Suite 501
New York, NY 10022
_Attorney for the Plaintiff_

Christopher L. Potter
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
J.F.K. Federal Building, Room 625
Boston, MA 02203
_Attorney for the Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

### I.    INTRODUCTION

Plaintiff Darron O. filed this action on January 24, 2020 under 42 U.S.C. § 405(g),

challenging the partial denial of his application for social security disability ("SSD") benefits

---

[1] Plaintiff commenced this action against the "Commissioner of Social Security." (Dkt. No. 1). Andrew M. Saul became the Commissioner on June 17, 2019 and will be substituted as the named defendant in this action. Fed. R. Civ. P. 25(d). The Clerk of Court is respectfully directed to amend the caption.

and supplemental security income ("SSI") under the Social Security Act.  (Dkt. No. 1).  The parties' briefs are now before the Court.  (Dkt. Nos. 10, 14).  After carefully reviewing the administrative record, ("R," Dkt. No. 7), the Court affirms the decision of the Commissioner.

## II.   BACKGROUND

### A.  Procedural History

Plaintiff applied for SSD and SSI benefits on May 31, 2016, alleging disability as of November 2, 2015.  (R. 96, 147–54).  Plaintiff's initial claim was denied, and a hearing was then held on April 24, 2018 before Administrative Law Judge ("ALJ") Edward L. Brady.  (R. 42–68).  On September 26, 2018, the ALJ issued a decision finding that Plaintiff was disabled as of July 18, 2017, but not earlier.  (R. 12–33).  Plaintiff's subsequent request for review by the Appeals Council was denied.  (R. 34–37).  Plaintiff then commenced this action.  (Dkt. No. 1).

### B.  Plaintiff's Background and Testimony

Plaintiff was born in 1967 and previously worked as a truck driver, a stable hand, a service manager, and an auto mechanic.  (R. 64–65, 147).  Plaintiff testified that he suffers from constant pain in his neck, shoulder, arms, lower back, and legs.  (R. 50).  He estimated he can: lift five to seven pounds; sit for fifteen minutes at one time; stand for five to ten minutes; and walk less than one block.  (R. 52–53, 58).  Plaintiff testified that he has difficulty with concentration due to his pain, as well as difficulty sleeping.  (R. 55, 57–59).  Plaintiff testified that he can care for his own personal needs, has a friend who helps with light cleaning around the house, only drives when necessary for short distances, and occasionally has difficulty manipulating buttons.  (R. 51, 54).  Plaintiff testified that he used to enjoy building models, but he can no longer sit long enough to do so.  (R. 56).

### C.  Medical Evidence

On November 2, 2015, Plaintiff had an MRI of the left shoulder due to shoulder

pain that radiated down to his hand.  (R. 975).  The study revealed evidence of prior rotator cuff

repair surgery and chronic degenerative changes.  (R. 975).  Later that same month, Plaintiff

underwent an MRI of the cervical spine because of neck pain that was radiating into the left arm.

(R. 976).  This showed a central broad-based disc herniation at C3-4 extending towards the right

more than left and flattening the ventral aspects of the spinal cord and minor disc herniations at

C2-3 and C4-5.  (R. 976).

On January 18, 2016, Plaintiff was evaluated for back and arm pain by Physiatrist Sheryl

Oleski, D.O.  (R. 295).  He reported pain since an accident on November 2, 2015 while climbing

into a truck; the pain was constant and ranged from 7 to 9 out of 10.  (R. 295).  Plaintiff also had

prior problems with lower back pain.  (R. 295).  On exam, Plaintiff had limited motion with

flexion, extension, and with bilateral bending and rotation, limited motion in the left shoulder,

decreased reflexes in the left upper extremity compared to the right, positive upper limb nerve

tension testing on the left, and positive Spurling's test on the left.[2]  (R. 296).  Dr. Oleski

diagnosed left cervical radiculopathy due to multilevel cervical disc protrusions and history of

rotator cuff repair.  (R. 297).  A cervical epidural steroid injection was recommended, and

Plaintiff was prescribed Gabapentin and Tramadol.  (R. 297).

On January 26, 2016, a physical exam revealed cervical spine and paraspinal tenderness

as well as positive Spurling's test.  (R. 273).  On February 5, 2016, Plaintiff underwent an

epidural steroid injection.  (R. 313–14).  On February 22, 2016, Neurosurgeon Stanley G.

Pugsley, Jr. evaluated Plaintiff, who reported persistent neck and left arm pain that began the

---

[2] The Spurling's test is a clinical examination maneuver used to evaluate cervical nerve root compression causing cervical radiculopathy.  (*See* Dkt. No. 10, p. 10 n. 6).

previous November. (R. 257). On exam, Plaintiff had decreased motion in the left shoulder with tenderness and positive impingement sign. (R. 259). Dr. Pugsley diagnosed cervicalgia and cervical radiculopathy and referred him for pain management. (R. 259). On February 24, 2016, Plaintiff reported no significant improvement with the prior epidural steroid injection. (R. 254). Plaintiff had tenderness in the cervical area and muscle spasms. (R. 256).

On February 26, 2016, Plaintiff returned to Dr. Oleski, reporting only temporary relief of his pain with the epidural steroid injection. (R. 301). Plaintiff's pain rated 9 out of 10 at the visit, and he stopped taking Tramadol due to a side effect of excessive fatigue. (R. 301). On exam, Plaintiff had a reciprocal gait pattern, tenderness to palpation in the area of the posterior tibialis tendons, limited cervical range of motion, weakness of the left upper extremity muscles, positive upper limb nerve testing on the left, and neck pain with Spurling's test. (R. 302). Dr. Oleski recommended another epidural injection, increased Plaintiff's Gabapentin, and prescribed Tylenol #3. (R. 302). Plaintiff received the epidural injection on March 10, 2016. (R. 310–12).

On March 22, 2016, Plaintiff had EMG testing of the upper extremities, which revealed right-sided carpal tunnel syndrome. (R. 289). At a follow-up with Dr. Oleski the next day, Plaintiff reported no response to the second epidural steroid injection. (R. 299). His pain remained 9 out of 10, and he also had lower back pain. (R. 299). On exam, Dr. Oleski found a reciprocal gait pattern, tenderness in the posterior tibialis tendons, limited cervical range of motion, weakness of the left arm muscles, positive upper limb nerve tension testing on the left, and neck pain with Spurling's test. (R. 299–300). Dr. Oleski diagnosed left cervical radiculopathy, history of left rotator cuff repair, and lower back pain. (R. 300).

On April 18, 2016, an EMG of the lower extremities indicated peripheral neuropathy. (R. 316–17).  On April 26, 2016, Plaintiff returned to Dr. Oleski with unchanged symptoms; he had a new finding of pain with straight leg raise testing on the left.  (R. 306).  On May 5, 2016, Plaintiff underwent an MRI of the lumbar spine that showed multilevel degenerative changes in the lumbar spine with Schmorl's nodes,[3] a mild disc bulge at L2-3, a broad-based disc bulge at L3-4 with moderate to severe central canal stenosis and mild bilateral neural foraminal stenosis, a broad-based disc bulge at L4-5 with mild central canal stenosis and foraminal narrowing, and a broad-based disc bulge at L5-S1 with an annular tear approximating the descending S1 nerve root and moderate left neural foraminal narrowing.  (R. 389–91).

Internist Quaser Amin, M.D., began treating Plaintiff on May 9, 2016.  (R. 780). Plaintiff's symptoms at the time included pain in his upper and lower back, rated as 8 out of 10. (R. 780).  On exam, Plaintiff had tenderness in the lumbar spine.  (R. 781).  Plaintiff began physical therapy the next day, and it was noted that he had tenderness on palpation of the lumbosacral spine, pain with limited range of motion in the lumbar spine, weakness of the lower extremities, tightness of the lumbosacral muscles, decreased sensation in the left shin and foot, and decreased sensation of the right ankle.  (R. 385–86).  It was recommended that Plaintiff do physical therapy twice a week for 4 to 6 weeks.  (R. 387).  Plaintiff had regular physical therapy through June 2, 2016.  (R. 368–69, 374–75, 381–83).

On June 10, 2016, Plaintiff was seen by Syed F. Ali Qadri, M.D.  (R. 363–65).  He reported back pain and numbness involving all four extremities.  (R. 363).  On exam, Dr. Qadri noted tenderness at L4-5; he diagnosed chronic back pain and degenerative joint disease and prescribed Flexeril and Tramadol.  (R. 364).

---

[3] A Schmorl's node refers to the herniation of nucleus pulposus through the cartilaginous and bony end plate into the body of the adjacent vertebra.  (Dkt. No. 10, p. 5 n. 14).

On June 22, 2016, Plaintiff had a follow-up with Dr. Oleski and continued to have neck pain radiating to the left arm with numbness, back pain, and foot pain. (R. 304). On exam, Plaintiff had a reciprocal gait pattern, tenderness to palpation in the area of the posterior tibialis tendons, limited cervical range of motion with left side bending and rotation, positive upper limb nerve testing on the left, and neck pain with Spurling's test. (R. 304–305). Dr. Oleski diagnosed Plaintiff with a history of cervical disc displacement with left cervical radiculopathy and a chronic history of back pain. (R. 305). Dr. Oleski stated that "I am really unsure as to what is going on with him." (R. 305). She recommends a surgical evaluation. (R. 305).

On July 12, 2016, Plaintiff had a follow-up with Dr. Amin and reported that Tramadol was not helping his pain. (R. 346). The exam showed tenderness in the lumbar spine; Dr. Amin recommended additional physical therapy and a surgical evaluation. (R. 347). Later that month, Plaintiff returned to Dr. Qadri reporting pain in his lower extremities with associated numbness, and no significant pain relief with medication. (R. 545–46). On exam, Plaintiff had tenderness at L4-5, normal straight leg raise test, and increased pain in feet due to touch. (R. 546). Dr. Quadri diagnosed idiopathic peripheral neuropathy and back pain. (R. 547).

 On August 16, 2016, an exam revealed cervical spine tenderness and muscle spasms. (R. 420). On August 22, 2016, Plaintiff had EMGs of the upper and lower extremities, which showed mild to moderate acute and chronic L4, L5, and S1 radiculopathy, mild C5 and C6 radiculopathy, moderate peripheral neuropathy, and mild carpal tunnel syndrome. (R. 413–14). The following day, Plaintiff had a follow-up with Dr. Amin, with physical exam findings remaining the same. (R. 702–03).

On August 30, 2016, Plaintiff was re-evaluated by neurosurgeon Dr. Pugsley. (R. 431). On exam, Plaintiff had: tenderness along the spine (worse in the lumbosacral region); full

6

strength in the upper extremities; pain and give-away weakness in the lower extremities, which limited evaluation and assessment of reflexes; abnormal sensation in the anterior and lateral legs, foot dorsum, and the soles of the feet; and an antalgic gait. (R. 433–34). Dr. Pugsley noted that he needed to review the EMG study before making treatment recommendations. (R. 434).

On September 14, 2016, Plaintiff was seen by neurologist Ahamed Karim, M.D. (R. 530). Plaintiff reported chronic low back pain radiating to the buttocks and thighs, pain in both feet, and chronic neck pain radiating to the left arm. (R. 531). A neurological exam revealed significant dysesthesias in the feet and an unsteady gait; Dr. Karim diagnosed chronic low back pain/lumbar radiculopathy, chronic neck pain/cervical radiculopathy, and idiopathic peripheral neuropathy. (R. 534). Dr. Karim prescribed Lyrica for pain. (R. 534). An MRI was performed on September 20, 2016, which showed disc desiccation at C3-4 with joint disease and a broad-based disc protrusion causing canal stenosis and neural foramina stenosis, and joint disease at C4-5, C5-6, and C6-7 with neural foraminal stenosis. (R. 465–67).

On October 26, 2016, Plaintiff was evaluated by Orthopedic surgeon Frank O'Brien, M.D. (R. 519). Plaintiff's symptoms included neck pain radiating into his arms and lower back pain radiating to the legs that was getting worse over time. (R. 519). On exam, Dr. O'Brien found Plaintiff had "marked" restriction of cervical motion and flattening of the lumbar lordosis; Dr. O'Brien felt that Plaintiff was likely going to require "invasive treatment, at least some pain management blocks." (R. 520). On October 27, 2016, Plaintiff saw Neurosurgery Specialist Victor Nakkache, M.D., for an evaluation of his back and neck pain. (R. 523). Dr. Nakkache reviewed Plaintiff's MRIs and found: "mild spondylosis but nothing of surgical relevance" in the cervical spine, and in the lumbar spine "evidence of congenital stenosis with associated spondylosis and post-op changes but no overt serious stenosis." (R. 523). Dr. Nakkache stated

that he did "not see any good evidence to recommend further surgery in the spine at this time." (R. 523).

On November 10, 2016, Plaintiff was evaluated by pain medicine specialist Thomas Hanlon, M.D. (R. 659). Plaintiff reported neck and lower back pain, but his low back pain bothered him the most. (R. 660). Dr. Hanlon recommended a lumbar epidural steroid injection. (R. 662). On November 15, 2016, Plaintiff returned to Dr. Amin and had tenderness in the cervical and lumbar spine and positive straight leg raising bilaterally. (R. 655). On January 30, 2017, Plaintiff underwent a lumbar steroid injection performed by Dr. Hanlon. (R. 599–600). Three days later, Plaintiff returned to Dr. Amin, who noted tenderness in the cervical, thoracic, and lumbar spine, weakness measured at 3/5 in the upper and lower extremities, diminished sensation in the lower extremities, a slow gait due to back pain, and an inability to sit for long periods. (R. 595).

On February 1, 2017, Dr. Amin completed questionnaires for Plaintiff's Spinal and Lumbar Spine Impairments. (R. 953–66). Dr. Amin diagnosed chronic lower back pain, chronic upper back pain, chronic neck pain, and peripheral neuropathy. (R. 953, 960). Clinical findings supporting the diagnoses included limited motion in the cervical and lumbar spine, tenderness of the cervical, thoracic, and lumbar spine, muscle spasms in the lumbar spine, sensory loss in the lower extremities, and an abnormal gait. (R. 953–54, 961). Plaintiff's primary symptoms were pain in the lower back, cervical spine, and thoracic spine; Dr. Amin stated that Plaintiff's symptoms and functional limitations were reasonably consistent with the impairments described in the evaluation. (R. 954, 962). Plaintiff's prognosis was guarded. (R. 953, 960).

Dr. Amin opined that Plaintiff was only able to sit for 1 hour and stand/walk 1 hour in an 8-hour workday.  (R. 955, 963).  He could sit for 30 minutes at a time before he needed to get up and move around.  (R. 956).  Plaintiff could occasionally lift/carry 5 to 10 pounds.  (R. 956, 963–64).  Dr. Amin assessed that Plaintiff's symptoms were constantly severe enough to interfere with attention and concentration.  (R. 957, 964).  Plaintiff was expected to require unscheduled breaks during a work day, and would be absent from work, on average, more than three times a month due to his impairments or treatment.  (R. 958, 965).

### D.  ALJ Decision Denying Benefits

On September 26, 2018, the ALJ issued a decision finding that Plaintiff was disabled as of July 18, 2017, but not earlier.  (R. 12–33).  At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in gainful employment since November 2, 2015, the alleged onset date of disability.  (R. 18).

At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had the following "severe" impairments: degenerative disc disease of the spine; degenerative joint disease of the right shoulder, status post repair; bone spur of the left foot, status post partial nail avulsion; chronic pain syndrome; and peripheral neuropathy.  (R. 18). At step three, the ALJ found that since November 2, 2015, Plaintiff "has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)."  (R. 20).

At step four, the ALJ determined that since November 2, 2015, Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a), 416.967(a), with the following additional limitations:

> The claimant is limited to only occasional overhead reaching with the bilateral upper extremities and up to frequent bilateral gross and fine manipulation involving the bilateral upper extremities. He can do occasional balancing, stooping, kneeling, crouching and no crawling without utilizing ladders, ropes, or scaffolds.

(R. 21).

Next, the ALJ found that since November 2, 2015, Plaintiff had been unable to perform any of his past work. (R. 26). The ALJ also found that on July 18, 2017, Plaintiff's age category changed to an individual closely approaching advanced age (50 years), which might seriously affect his ability to adjust to other work. (R. 27) (*See also* 20 C.F.R. § 404.1563(d)). But the ALJ found that before July 18, 2017, based on Plaintiff's age, education, work experience, and RFC, there were jobs in the national economy that he could have performed. (R. 27). Based on testimony from a Vocational Expert, the ALJ found that Plaintiff could have performed jobs including order clerk, telephone information clerk, and charge account clerk. Accordingly, the ALJ concluded that Plaintiff was not disabled until July 18, 2017. (R. 27).

## III.   DISCUSSION

### A.  Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Regulations define residual functional capacity ("RFC") as "the most you can still do despite your limitations," including limitations on physical and mental abilities. 20 C.F.R. §§ 404.1545, 416.945. In assessing the RFC of a claimant with multiple impairments, the Commissioner considers all "medically determinable impairments, including . . . medically determinable impairments that are not 'severe.'" *Id.* §§ 404.1545(a)(2), 416.945(a)(2). The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B.  Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record

as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is affected by legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018). In other words, there must be substantial evidence to support a finding of functional limitations or lack thereof.

Relatedly, under the treating physician rule, an ALJ generally owes "deference to the medical opinion of a claimant's treating physician." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the

treating source opinion controlling weight." *Id.* When a treating physician's opinions are

disregarded, the ALJ must provide "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(d).

Indeed, the Second Circuit has instructed that courts should "not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

opinion" or when the ALJ's opinion does not "comprehensively set forth reasons for the weight

assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.

Recently, in *Estrella v. Berryhill*, the Second Circuit reiterated its mandate that ALJs

must follow specific procedures in determining the appropriate weight to assign a treating

physician's opinion. *See generally* 925 F.3d 90, 95–98 (2d Cir. 2019). The Circuit described

the applicable standard, writing that:

> First, the ALJ must decide whether the opinion is entitled to
> controlling weight. "[T]he opinion of a claimant's treating
> physician as to the nature and severity of [an] impairment is given
> 'controlling weight' so long as it 'is well-supported by medically
> acceptable clinical and laboratory diagnostic techniques and is not
> inconsistent with the other substantial evidence in [the] case
> record.'" *Burgess*, 537 F.3d at 128 (third brackets in original)
> (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides
> the opinion is not entitled to controlling weight, it must determine
> how much weight, if any, to give it. In doing so, [the ALJ] must
> "explicitly consider" the following, nonexclusive "*Burgess*
> factors": "(1) the frequen[cy], length, nature, and extent of
> treatment; (2) the amount of medical evidence supporting the
> opinion; (3) the consistency of the opinion with the remaining
> medical evidence; and (4) whether the physician is a specialist."
> *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)
> (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. §
> 404.1527(c)(2))). At both steps, the ALJ must "give good reasons
> in [its] notice of determination or decision for the weight [it gives
> the] treating source's [medical] opinion." *Halloran v. Barnhart*,
> 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. §
> 404.1527(c)(2)).

*Id.* at 95–96 (citing inter alia *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008)). The Circuit

noted that failure to "explicitly consider" these factors is a procedural error warranting remand

unless a "searching review of the record assures the reviewing court that the substance of the treating physician rule was not traversed." *Id.*

### C. Analysis

Plaintiff now challenges the disability decision on the basis that the ALJ: 1) failed to properly weigh the medical opinion evidence and failed to properly determine Plaintiff's RFC; and 2) failed to properly evaluate Plaintiff's subjective symptoms. (Dkt. No. 10). In response, the Commissioner contends that the ALJ properly weighed the medical opinion evidence and that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective symptoms. (Dkt. No. 14).

### 1) Medical Opinion Evidence

First, Plaintiff argues that the ALJ failed to properly follow the treating physician rule because he did not give controlling weight to the opinion of Dr. Amin or provide adequate reasons for discounting this opinion. (Dkt. No. 10, pp. 12–16). In response, the Commissioner contends that Dr. Amin's opinions are inconsistent with substantial evidence in the record and the ALJ gave good reasons for discounting them. (Dkt. No. 14, p. 6).

Dr. Amin completed two questionnaires regarding Plaintiff's impairments, which indicated in relevant part that he could only: sit for 1 hour total and stand/walk 1 hour total in an 8-hour workday; sit for 30 minutes at a time; occasionally lift/carry 5 to 10 pounds; and his symptoms were constantly severe enough to interfere with attention and concentration. (R. 953–66). The ALJ decided to give Dr. Amin's opinion "no weight because it is simply not supported by the evidence." (R. 26). The ALJ stated that "[w]hile the [Plaintiff] clearly has some structural abnormalities with regard to his neck and back, there is no evidence to indicate that the [Plaintiff] would be so limited as stated here." (R. 26). The ALJ added that "repeat

examinations . . . showed some moderate positive findings, mostly in the lower extremities, but not enough to support the drastic limitations noted by Dr. Amin." (R. 26).

The ALJ's analysis does not explicitly address all of the *Burgess* factors. In particular, the ALJ did not consider the frequency, length, nature, and extent of Plaintiff's treatment with Dr. Amin. *See* 20 C.F.R. § 404.1527(c)(2). Nonetheless, the Court finds that the ALJ gave good reasons for discounting Dr. Amin's restrictive opinion based on substantial evidence in the record that Plaintiff was not so limited. The ALJ recognized that Plaintiff "has some clear pathology regarding his neck and low back," but that "physical examinations show only mild to moderate findings." (R. 26). The ALJ's decision cited evidence that Plaintiff had: 1) mild to moderate central canal with moderate right-sided neural foraminal stenosis at C3-4; 2) uncovertebral joint disease at C5-6 with mild right and moderate left neural foraminal stenosis; 3) mild disc bulge at L2-L3; 4) mild bilateral neural foraminal narrowing at L3-L4; 5) mild central canal stenosis and mild facet hypertrophy at L4-L5, with moderate left neural foraminal narrowing and mild right neural foraminal narrowing; 6) moderate right greater than left neural foraminal narrowing at L5-S1; 7) mild to moderate acute and chronic L4, L5 and S1 radiculopathy with paraspinal muscle spasms; 8) mild acute and chronic C5 and C6 radiculopathy with paraspinal muscle spasm; and 9) no evidence of spinal cord impingement. (R. 22–24). The ALJ also cited evidence that on several examinations, Plaintiff had normal gait, full 5/5 strength in the upper extremities, and negative Spurling's tests. (*Id.*).

Accordingly, the ALJ's analysis cited substantial contrary evidence in giving no weight to the opinion of Dr. Amin. *See Heaman v. Berryhill*, 765 F. App'x 498, 501 (2d Cir. 2019) (finding that the ALJ provided "good reasons" for giving the treating physicians' opinions less weight, "including that their opinions were 'merely checkbox forms that offer little or nothing

with regard to clinical findings and diagnostic results,' and, further, were inconsistent with the moderate findings reflected in the doctors' notes"); *Rorick v. Colvin*, 220 F. Supp. 3d 230, 239 (N.D.N.Y. 2016) (finding no error in the ALJ's assignment of "no weight" to treating physician's opinion, based on substantial evidence to the contrary). !

Moreover, the above evidence also supports the ALJ's RFC determination.  In assigning Plaintiff an RFC for sedentary work with additional limitations, the ALJ relied on "objective diagnostic tests and clinical findings on physical and mental examinations, the [Plaintiff's] longitudinal treatment history, and his documented activities of daily living."  (R. 26).  Although Plaintiff cites evidence indicating more severe limitations, it is up to the ALJ to resolve genuine conflicts in the medical record.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Notably, the mild to moderate exam findings are consistent with an RFC for sedentary work— which encompassed limitations related to walking, lifting, and carrying.[4]  The limitations added by the ALJ for reaching and manipulation also address findings of neuropathy and radiculopathy in the upper extremities.  (R. 22).  Indeed, the state agency consultant Dr. Herbert Blumenfeld went even further, finding that "the many exams from multiple facilities do not support a basis for limitation of standing/walking or significant limitation of lift/carry."  (R. 75).

The ALJ also pointed out that while Plaintiff received several epidural steroid injections, Neurosurgery Specialist Dr. Nakkache reviewed Plaintiff's imaging in 2016 and "did not find evidence to recommend surgery in the spine."  (R. 24).  And the ALJ noted that Plaintiff "is independent in activities of daily living," does not use a cane or assistive device to walk and can

---

[4] *See* 20 C.F.R. §§ 404.1567(a) and 416 .967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

drive himself.  (R. 22).  In sum, the Court finds that the ALJ cited substantial evidence in support of the RFC.  *See H. v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 153 (N.D.N.Y. 2012) ("Although the record clearly demonstrates consistent complaints of pain and other limitations, the record contains sufficient evidence to support the ALJ's RFC assessment.").

### 2)  Subjective Symptoms

Next, Plaintiff argues that the ALJ failed to properly evaluate and credit his subjective symptoms of disabling pain.  (Dkt. No. 10, pp. 18–20).  The Regulations require a two-step process for the ALJ to assess a claimant's subjective symptoms.  First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. § 404.1529(a).  Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(b)-(c).  When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the claimant's statements considering the details of the case record as a whole, including daily activities, precipitating and aggravating factors, and medication and other treatment.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported for the reasons explained in this decision."  (R. 25).  The ALJ explained that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with imaging of his spine, which showed mild to moderate findings.  (R. 23).

Indeed, all of the evidence cited for the RFC discussed above can also be used to support the ALJ's evaluation of Plaintiff's symptoms. While there is no doubt that Plaintiff reported pain, took medication and underwent steroid injections, his doctors noted on several occasions that the pain was idiopathic in nature, meaning that its cause could not be determined. (*See* R. 305, 534, 537). And as noted above, Neurosurgery Specialist Dr. Nakkache reviewed Plaintiff's imaging and did not recommend spine surgery, indicating that more invasive treatment was unnecessary. (R. 523). Besides the imaging and exam findings, the ALJ also cited Plaintiff's independent activities of daily living, which undermined his allegations of disabling pain. In sum, the ALJ evaluated Plaintiff's subjective symptoms using the details of the record as a whole. While Plaintiff may disagree with the result, the Court finds no error in the ALJ's analysis and reasoning. *See Miller v. Colvin*, 85 F. Supp. 3d 742, 756–57 (W.D.N.Y. 2015) (affirming the ALJ's decision to discount the plaintiff's subjective complaints based on substantial evidence to the contrary); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270–72 (N.D.N.Y. 2009) (same).

### IV.    CONCLUSION

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record. Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Memorandum-Decision and Order to the parties in accord with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date: November 5, 2020
       Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge

19